FILED
2012 Sep-19 PM 01:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

METRO BANK, an Alabama Banking Corporation

Plaintiff,

v.

MISSISSIPPI VALLEY TITLE INSURANCE COMPANY, a Mississippi Corporation,

Defendant.

CASE NO.: CV-10-RRA-03353-M

**MEMORANDUM OF OPINION**

This action is a dispute over title insurance that arises out of two loans which the plaintiff, Metro Bank, made to individuals for construction of a home in Etowah County, Alabama. Defendant Mississippi Valley issued title commitments and title insurance policies to Metro Bank in connection with the mortgages securing those loans. The plaintiff sues the defendant for breach of contract and negligence, contending that the plaintiff did not know about a deed restriction when it made the loans. It demands that the defendant indemnify it for losses incurred as a result. The case is before the court on the defendant's motion for summary judgment. (Doc. 27.)

STANDARD

In considering a motion for summary judgment, the court must determine whether the moving party is entitled to judgment as a matter of law. Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as

a matter of law. Fed. R. Civ. P.56. In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). Once that initial burden has been carried, the non-moving party may not merely rest upon his pleadings, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990).

## FACTS

During and shortly after World War II, the United States Army maintained a military installation in Alabama known as Camp Sibert. Camp Sibert covered approximately 36,000 acres in Etowah County and portions of St. Clair County. At least part of the activities of Camp Sibert included training in chemical weapons use and decontamination. (Doc. 28-16, pp. 5(16)-6(17).) Soldiers trained with mustard, tear gas, lewisite, and phosgene. After the camp was closed, the federal government sold the land back to its former owners pursuant

to the Surplus Property Act. The general character of this property is "wooded, open, and there is some residential development in that area and there are houses along the road in different places." (Doc. 28-1, p. 7(23).) The area has been successfully developed for both residential and commercial purposes. (Doc. 28-2, p. 16(60).) The U.S. Army Corps of Engineers has been involved in environmental remediation of the former Camp Sibert essentially since the camp closed around 1945. The Corps of Engineers' work has been to determine what was done, where it was done, and if there are any environmental problems that need to be addressed anywhere on the Camp Sibert property. The Corps of Engineers divided the Camp Sibert property into several different "sites." The sites were designated based on the Army's use of Camp Sibert.

One site was designated by the Corps of Engineers as Site 2A. Karl Blankinship is the project manager for the Corps of Engineers for the Camp Sibert remediation. He testified that his group found "chemically contaminated soil" there. (Doc. 28-16, p. 17(61).) The Corps of Engineers has removed some chemically contaminated soil from Site 2A and disposed of it. Site 2A is adjacent to Perman Lake Road in Rainbow City, Alabama. Site 2A was used to train soldiers in the decontamination of different items. The Corps of Engineers geophysically mapped Site 2A, and numerous soil and groundwater samples were taken from the site. On Site 2A, the Corps of Engineers investigated four burial pits that had previously been decontaminated and found some chemically contaminated soil within the burial pits. These pits were investigated in approximately 2008. One of the four pits is located close to the boundary of the property at issue in this case. (Doc. 28-16, p. 25(96).)

Mr. Blankinship has no knowledge of any actual harm to any living thing resulting

from possible contamination on Site 2A. However, he cannot say that there was nothing harmful there. (Doc. 28-16, p. 29(109).) At the time of Blankinship's deposition, the Corps of Engineers had not left site 2A.

Located within the former boundaries of Camp Sibert is an 11.5 acre parcel in Rainbow City, Alabama, located at 701 Perman Lake Road (the "Hallmark property"). As with the other tracts that were formerly part of Camp Sibert, this tract was transferred back to private hands long ago. On or about December 15, 2004, William Ronald Knight, the then owner of the Hallmark property, sold the parcel to Joseph Hallmark and his wife, Johnnie Hallmark. A portion of this property might be within Site 2A. Metro Bank has not done any investigation, testing, or surveying of its property to determine whether there is any contamination on it.

The sale is interesting because of the particulars of the deed. In transferring all of the Camp Sibert properties back to its former owners, the U.S. Government used deeds which recite that the "property was subjected to contamination by the introduction of unexploded and dangerous bombs, shells, rockets, mines, and charges, either upon or below the surface thereof." (Doc. 28-5, p. 2.) The deeds go on to represent that "the Corp of Engineers, War Department, has caused the property to be inspected and has decontaminated the same to the extent deemed reasonably necessary." (Doc. 28-5, p. 2.) The peculiarities of the Camp Sibert deeds are familiar to real estate attorneys in and around Etowah County, and those attorneys routinely have approved titles to such property for decades. At this time, the presence of such a deed in a chain of title in Etowah County is unremarkable and expected in certain locations.

The deed in the instant case, however, is slightly different. When the Hallmarks

bought the property in December 2004, there was a deed from the United States of America by the Federal Farm Mortgage Corporation to Ernest Moore in the chain of title. The date of the transfer from the United States to Ernest Moore was September 21, 1949. While this deed contains the same language described above, it also contained language stating that the property was "[r]estricted to grazing purposes only." (Doc. 28-5, p. 2.) It is this language which causes the problem in the instant case.

Knight's attorney in the sale of the property to the Hallmarks was Gadsden real estate attorney Mike Haney.[1] Haney states that the instant deed is the only deed from the former Camp Sibert property which contains the "restricted to grazing purposes only" language. When Haney saw this language he wrote to federal officials about the language in an attempt to clarify its meaning. In response to his letter, Haney received a letter dated December 6, 2004 from the Office of the General Counsel of the United States Department of Agriculture. The letter stated that the Federal Farm Mortgage Corporation had been abolished in 1961 and that all of its assets had been "long ago liquidated." (Doc. 28-7, p. 2.) The letter further stated that:

> I want to advise you that USDA has no restriction in force, and I see no scenario where there would be any enforcement of the language "restricted to grazing purposes only" placed on your client's property in a deed from the now defunct Federal Farm Mortgage Corporation ("FFMC"). The FFMC is not an agency of USDA. This restriction would not be enforced by our office, or by anyone else we can think of, as the FFMC and its powers and functions were abolished over 40 years ago in 1961 per 12 U.S.C. 1020.

(Doc. 28-7, p. 2.)

---

[1]Haney is both a fact witness and the defendant's paid expert in this matter.

Haney then prepared the deed from Knight to the Hallmarks. That deed expressly referenced the 1949 deed, providing that the property was conveyed subject to "[t]erms, conditions and reservations as set out in that certain deed recorded in Book 415, page 449, Probate Office, Etowah County, Alabama." (Doc. 28-8, p. 2.) Haney says that this would give notice to any future purchaser of the restriction. Haney calls this provision, "just good real estate practice." (Doc. 28-1, p. 18(67).) The legitimacy of this transaction is not contested. Instead, the problem in this case arises from the later transaction entered into by the Hallmarks.

When the Hallmarks decided to build a home on the property, they borrowed $148,000.00 from Metro Bank as a construction loan. At the request of Metro Bank, George Day, on behalf of Mississippi Valley, issued title insurance commitment No. V500213 with an effective date of January 2, 2005, committing to insure Metro Bank, as mortgagee, in an amount up to $148,000.00. George Day is a real estate attorney, with thirty years of experience, practicing in Gadsden, Alabama. Day is also a title agent for Mississippi Valley. He issues title insurance commitments, performs title searches, and issues policies for Mississippi Valley. Upon receiving a request for a title commitment, Day's practice is to obtain a chain of title from Etowah Abstract Company, examine the instruments on the chain of title, then prepare and issue the commitment. If the commitment requirements are met, and the premium is paid, Day will issue a Mississippi Valley policy.

Schedule B-Section II of the commitment set forth eight (8) items that would be excepted from coverage under the policy, once issued. Item 7 of the Exceptions was "Restrictive Covenants, if any." Following the closing of the $148,000 loan, Day, on behalf

of Mississippi Valley, issued Policy No. C941505 to Metro Bank. Schedule B-1 of the policy provides that:

> This policy does not insure against loss or damage by reason of the following:
>
> * * *
>
> Item 7. Restrictive Covenants, if any.

(Doc. 28-11, p. 3.) In addition to issuing a commitment for the title and the title policy, Day also handled the closing of this loan.

Several months later, in August 2006, Metro Bank requested from Mississippi Valley another title commitment in connection with a second loan to the Hallmarks so they could finish construction of their home. The amount of this loan was $30,800.00. As with the first loan transaction, this request came to Day, who updated the title search and issued title insurance commitment No. V534042 with an effective date of September 1, 2006. Again, Item 7 of Schedule B-Section II stated that the title insurance policy, once issued, would except from coverage "Restrictive Covenants, if any." This exclusion, and the same exclusion in the previous policy, is a standard provision put in Mississippi Valley policies. The second loan from Metro Bank to the Hallmarks closed in early September 2006, and Metro Bank took a second mortgage securing the $30,800.00. Mississippi Valley issued Policy No. C946757 to Metro Bank effective September 20, 2006. Item 7 of Schedule B-1 of the policy excluded from coverage "Restrictive Covenants, if any."

The parties agree that Day was acting as an agent for Mississippi Valley, within the line and scope of his employment, when preparing and issuing the two commitments and policies.

Day was aware that the purpose of the two Metro loans was for the construction of a home on the Hallmark property. Metro Bank is the named insured in both title policies.

The Hallmarks completed construction of the home; however, they eventually defaulted on their payment obligations to Metro Bank. Metro Bank foreclosed on the property on April 22, 2009, and bid $187,760.77 on it as evidenced by the Foreclosure Deed of April 22, 2009. Metro Bank now holds title to the Hallmark Property.

Haney contends that the purported restriction is invalid, but he admits that if it is valid "it could certainly go forward and affect title to property in that chain." (Doc. 28-1, p. 11(40).)

## ANALYSIS

The complaint contains three counts. Counts One and Two claim that the defendant breached its contract with the plaintiff in that it has failed to pay to the plaintiff the amount due under the policies. (Doc. 1-1, p. 4.) Count Three alleges that the defendant negligently performed the title examination on the property in that it "failed to determine an encumbrance on the real property that was the subject of the examination." (Doc. 1-1, p. 5.) The plaintiff alleges that it has been damaged by the defendant's negligence in that "the [p]laintiff made loans secured by real property that is contaminated, restricted to grazing only and has a value far less than the loans made by the [p]laintiff." (Doc. 1-1, p. 5.)

### The Language In the Deed Is a Restrictive Covenant and Is Expressly Excluded from Coverage.

Count I of the Complaint alleges that Mississippi Valley has breached its obligations under Policy C941505, which was issued in connection with the initial construction loan of $148,000.00. Count II alleges that Mississippi Valley has breached its obligations under Policy C946757, which was issued in connection with the second loan of $30,800.00.

> "The elements of a breach-of-contract claim under Alabama law are (1) a valid contract binding the parties; (2) the plaintiff['s] performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages." *Shaffer v. Regions Fin. Corp.,* 29 So.3d 872, 880 (Ala.2009). "The requisite elements of a valid contract include: an offer and an acceptance, consideration, and mutual assent to terms essential to the formation of the contract." *Avis Rent A Car Sys., Inc. v. Heilman,* 876 So.2d 1111, 1118 (Ala.2003) (citations, brackets and internal quotation marks omitted); *see also Macon Cnty. Greyhound Park, Inc. v. Knowles,* 39 So.3d 100, 107 (Ala.2009).

*Alabama Mun. Ins. Corp. v. Alliant Ins. Services, Inc.*, 2:09-CV-928-WKW, 2012 WL 39950 at *4 (M.D. Ala. Jan. 9, 2012). The policies are on the same form — American Land Title Association ("ALTA") Loan Policy, 10-17-92. The insuring language of the policies states, in pertinent part:

> SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, MISSISSIPPI VALLEY TITLE INSURANCE COMPANY . . . insure[s], as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of . . . [a]ny defect in or lien or encumbrance on the title.

(Doc. 28-11, p. 1.)

Counts One and Two claim that the title to the property is tainted because the "restricted to grazing purposes only" language contained in the 1949 deed, which is in the chain of title to the Hallmark Property, is an "encumbrance" on the title to the property of which it was not aware. (Doc. 29, p. 17.) It therefore seeks coverage under the title insurance policy. The policies do not define "encumbrance," and the plaintiff spends the first

part of his brief arguing that the language in the deed is in fact an encumbrance.

In this case, however, it is unnecessary to determine whether the language is an encumbrance, because it is definitely a restrictive covenant and, therefore, is expressly excluded from coverage. The Alabama Supreme Court has noted that

> [a] contract of insurance, like other contacts, is governed by the general rules of contracts. *Pate v. Rollison Logging Equip., Inc.,* 628 So.2d 337 (Ala. 1993). Insurance companies are entitled to have their policy contract enforced as written. *Gregory v. Western World Ins. Co.,* 481 So.2d 878 (Ala.1985). "Insurance contracts, like other contracts, are construed so as to give effect to the intention of the parties, and, to determine this intent, a court must examine more than an isolated sentence or term; it must read each phrase in the context of all other provisions." *Attorneys Ins. Mut. of Alabama, Inc. v. Smith, Blocker & Lowther, P.C.,* 703 So.2d 866, 870 (Ala.1996).

*Twin City Fire Ins. Co. v. Alfa Mut. Ins. Co.*, 817 So. 2d 687, 691-92 (Ala. 2001). Further,

> "exceptions to coverage must be interpreted as narrowly as possible to provide the maximum coverage available." *Sullivan v. State Farm Mut. Auto. Ins.,* 513 So.2d 992, 994 (Ala.1987).
>
> > "It is well established ... that when doubt exists as to whether coverage is provided under an insurance policy, the language used by the insurer must be construed for the benefit of the insured. Likewise, when ambiguity exists in the language of an exclusion, the exclusion will be construed so as to limit the exclusion to the narrowest application reasonable under the wording. *Guaranty National Ins. Co. v. Marshall County Board of Educ.,* 540 So.2d 745 (Ala.1989). However, **it is equally well settled that in the absence of statutory provision to the contrary, insurers have the right to limit their liability by writing policies with narrow coverage**. If there is no ambiguity, courts must enforce insurance contracts as written and cannot defeat express provisions in a policy, including exclusions from coverage, by making a new contract for the parties. *Johnson v. Allstate Ins. Co.,* 505 So.2d 362 (Ala.1987)."
>
> *St. Paul Mercury Ins. Co. v. Chilton-Shelby Mental Health Ctr.,* 595 So.2d 1375, 1377 (Ala. 1992).

*Porterfield v. Audubon Indem. Co.*, 856 So. 2d 789, 799-800 (Ala. 2002) (emphasis added).

Schedule B-1 of each of the policies states: "This policy does not insure against loss or

damage by reason of the following: . . . Item 7. Restrictive covenants, if any." (Doc. 28-11, p. 4.) It is agreed by the parties that this is a standard exception to coverage. The plaintiff first argues that it "should not be bound by a standard exception to coverage because of the failure of Mississippi Valley's agent to inform the bank with regard to the existence of the land use restriction. To do so would be unconscionable." (Doc. 29, p. 24.) This argument does not contend that the "restricted to grazing purposes" language is *not* a restrictive covenant. It contends only that, because the plaintiff was not told that this restriction was in the deed, the plaintiff should not be bound by the exception to coverage. The plaintiff provides no authority to support this position and the court knows of no such rule. The court therefore finds the argument to be without merit.

The plaintiff next sets out the types of unconscionability existent under Alabama law. At first it appears as if the plaintiff intends to enlarge on its earlier argument that the failure to inform it of the "grazing" language is unconscionable. However, that point is never raised again. Therefore, it seems that the plaintiff is arguing generally that the restriction itself is unconscionable.

> "' "An unconscionable ... contractual provision is defined as a ... provision 'such as no man in his sense and not under delusion would make on the one hand, and as no honest and fair man would accept on the other.' " ' *Southern United Fire Ins. Co. v. Howard,* 775 So.2d 156, 163 (Ala. 2000) (quoting *Layne v. Garner,* 612 So.2d 404, 408 (Ala. 1992), quoting in turn *Lloyd v. Service Corp. of Alabama,* 453 So.2d 735, 739 (Ala. 1984), and *Hume v. United States,* 132 U.S. 406, 410, 10 S.Ct. 134, 33 L.Ed. 393 (1889)). In *Layne v. Garner,* this Court first undertook to announce an explicit standard for determining whether a contract or contractual provision is unconscionable:
>
>> " 'In addition to finding that one party was unsophisticated and/or uneducated, a court should ask (1) whether there was an absence of meaningful choice on one party's part, (2) whether the contractual terms are unreasonably favorable to one party, (3) whether

> there was unequal bargaining power among the parties, and (4) whether there were oppressive, one-sided, or patently unfair terms in the contract.'

"612 So.2d at 408. 'For ease of discussion,' this Court has at times reduced the *Layne v. Garner* test to two essential elements: '(1) terms that are grossly favorable to a party that has (2) overwhelming bargaining power.' *American Gen. Fin., Inc. v. Branch,* 793 So.2d 738, 748 (Ala.2000). In addition, this Court recognizes a distinction between 'substantive unconscionability' and 'procedural unconscionability.' Substantive unconscionability

> " ' "relates to the substantive contract terms themselves and whether those terms are unreasonably favorable to the more powerful party, such as terms that impair the integrity of the bargaining process or otherwise contravene the public interest or public policy; terms (usually of an adhesion or boilerplate nature) that attempt to alter in an impermissible manner fundamental duties otherwise imposed by the law, fine-print terms or provisions that seek to negate the reasonable expectations of the nondrafting party, or unreasonably and unexpectedly harsh terms having to do with price or other central aspects of the transaction." '

"*Ex parte Thicklin,* 824 So.2d 723, 731 (Ala.2002) (emphasis omitted) (quoting *Ex parte Foster,* 758 So.2d 516, 520 n. 4 (Ala.1999), quoting in turn 8 Richard A. Lord, *Williston on Contracts* § 18:10 (4th ed.1998) ). Procedural unconscionability, on the other hand, 'deals with "procedural deficiencies in the contract formation process, such as deception or a refusal to bargain over contract terms, today often analyzed in terms of whether the imposed-upon party had meaningful choice about whether and how to enter into the transaction." ' *Thicklin,* 824 So.2d at 731 (quoting *Foster,* 758 So.2d at 520 n. 4)."

*Leeman v. Cook's Pest Control, Inc.*, 902 So.2d 641, 645 (Ala.2004).

*Ryan's Family Steakhouse, Inc. v. Kilpatric*, 966 So. 2d 273, 285 (Ala. Civ. App. 2006).

The burden is on the plaintiff to show that the restriction is unconscionable. *Ryan's Family Steakhouse, Inc. v. Kilpatric*, 966 So. 2d 273, 285 (Ala. Civ. App. 2006) ("The party asserting [unconscionability] defense bears the burden of proof."). Metro Bank makes no attempt to set out the requirements for this showing or to explain how they are satisfied in this case.

The plaintiff then argues that the agreements are vague and ambiguous as to what constitutes a restrictive covenant. (Doc. 29, p. 26.) It argues that "[t]he two commitments fail to define or state the purpose of the restrictive covenants coverage exclusion." (Doc. 29, p. 26.) Again, as shown above, if the language is ambiguous the court may limit it to the narrowest construction possible.

As to the first point, "[a]n undefined word or phrase in an insurance policy does not create an inherent ambiguity. To the contrary, where questions arise as to the meaning of an undefined word or phrase, the court should simply give the undefined word or phrase the same meaning that a person of ordinary intelligence would give it." *Twin City Fire Ins. Co. v. Alfa Mut. Ins. Co.*, 817 So. 2d 687, 692 (Ala. 2001) *(citing Carpet Installation & Supplies of Glenco v. Alfa Mut. Ins. Co.,* 628 So.2d 560 (Ala.1993).) Blacks Law Dictionary defines "restrictive covenant" as "[a] private agreement, usually in a deed or lease, that restricts the use or occupancy of real property, especially by specifying lot sizes, building lines, architectural styles, and the uses to which the property may be put." Black's Law Dictionary (9th ed. 2009). The phrase "restricted to grazing purposes only" falls squarely within this definition. As to the second point, the plaintiff does not explain why the failure to set out the restriction's purpose makes it ambiguous. As to the plaintiff's argument that the exclusion is vague and ambiguous because the other seven exclusions in the policies "give an example or context to the item being excluded from coverage" (doc. 29, p. 26), the fact that the exclusion does not give an example does not make it ambiguous. The plaintiff cites no authority to the contrary.

The "grazing" restriction is a restrictive covenant under the language of the contracts

in this case. It is therefore excluded from coverage. Counts One and Two are therefore due to be dismissed.

<u>The Negligence Claim In Count Three Fails</u>
<u>Because the Defendant Had No Duty to the Plaintiff</u>

Count Three alleges that the defendant "negligently performed [a] title examination in that [it] failed to determine the encumbrance on the real property that was the subject of the examination." (Doc. 1-1, p. 5.) In Alabama,

> "[i]t is axiomatic that to maintain a negligence claim, one must point to the existence of a duty on the part of the defendant." *Smith v. AmSouth Bank, Inc.,* 892 So.2d 905, 909 (Ala.2004) (citing *Patrick v. Union State Bank,* 681 So.2d 1364, 1367 (Ala.1996)); *Morton v. Prescott,* 564 So.2d 913, 915 (Ala.1990) ("It is settled that for one to maintain a negligence action the defendant must have been subject to a legal duty."). Furthermore, "[i]t is a well-established rule of law in this state that in order to prove a claim of negligence a plaintiff must establish that the defendant breached a duty owed by the defendant to the plaintiff and that the breach proximately caused injury or damage to the plaintiff." *Lowe's Home Ctrs., Inc. v. Laxson,* 655 So.2d 943, 945-46 (Ala.1994).

*Zanaty Realty, Inc. v. Williams*, 935 So. 2d 1163, 1167 (Ala. 2005).

Here, the plaintiff has failed to establish a duty owed to it by the defendant. While Alabama law does require that a title insurer perform a title search prior to issuing a "preliminary report, commitment, binder, policy, or contract of title insurance," Ala Code § 27-25-5, the law is equally clear that searches "relating to matters of title performed in connection with the issuance of a preliminary report, commitment, or binder shall be solely for the benefit of the title insurance company requested to issue its policy or policies of title insurance." Ala. Code § 27-25-3(10). Day, on behalf of the defendant, conducted the title search "in connection with the issuance of a . . . commitment." Accordingly, under Alabama

law, he did so solely for the benefit of the defendant.

The above-cited sections of the Alabama Code were enacted in 2001. The plaintiff cites three pre-2001 cases for the proposition that there *is* a duty in this case. (Doc. 29, pp. 27-29.) The plaintiff does not, however, mention the 2001 statute. There is no Alabama case analyzing whether a duty still exists following enactment of that statute. However, it appears that the subject statutory language was included in the 2001 statute only to eliminate any such duty. Such a construction is consistent with the majority view. *See Walker Rogge, Inc. v. Chelsea Title & Guar. Co.*, 116 N.J. 517, 538, 562 A.2d 208, 219 (1989) ("The prevailing view remains not to impose liability in tort on a title company."). A title insurer performs searches for *its own benefit*, not for the benefit of the insured. See *Anderson v. Title Ins. Co.*, 103 Idaho 875, 655 P.2d 82 (1982); *Horn v. Lawyers Title Ins. Co.*, 89 N.M. 709, 711, 557 P.2d 206, 208 (1976) ("Defendant clearly had no duty under the policy to search the records, and any search it may have actually undertaken, was undertaken solely for its own protection as indemnitor against losses covered by its policy.") At least one commentator who has examined the Alabama statute agrees. *The Alabama Title Insurance Act of 2001*, 63 Ala. Law. 169, 173 (2002) states that

> Alabama has legislatively embraced the majority view that neither the title agent nor title insurer should have tort liability to the insured or proposed insured, in connection with its title examination performed in connection with the preparation of a title commitment or the issuance of a title policy.

*Id*. at 173.

The court determines that the defendant owed no duty to the plaintiff in this case. Accordingly, its negligence claim in Count Three must fail.

CONCLUSION

Accordingly, the motion for summary judgment is due to be GRANTED. An appropriate order will be entered.

DONE this 19th day of September, 2012.

Robert R. Armstrong, Jr.
United States Magistrate Judge